IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| GREGORY RUSSEAU, | § | |
| Petitioner, | § | |
| vs. | | No. 6:10cv449 |
| | § | |
| RICK THALER, Director, | | |
| Texas Department of Criminal Justice, | § | |
| Institutional Division, | | |
| | § | |
| Respondent. | | |

## <u>MEMORANDUM OPINION</u>

Gregory Russeau ("Russeau"), an inmate confined to the Texas Department of Criminal Justice, Correctional Institutions Division, filed an application for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.  Russeau challenges his capital murder conviction and death sentence imposed by the 114th Judicial District Court of Smith County, Texas, in cause Nos.114-0750-02 and 114-0750-02B, both styled *The State of Texas vs. Gregory Russeau.*  Respondent Rick Thaler ("the Director") answered the application.  Having considered the circumstances alleged and authorities cited by the parties, and having reviewed the record, the Court finds that the application is not well-taken and it will be denied.

**Facts**

On May 30, 2001, 75–year–old James Syvertson was murdered at his Tyler auto repair garage. Syvertson's widow testified at trial that he left for work at approximately 7:00 a.m. and that she spoke with him on the telephone sometime that morning. She further testified that he ate lunch at

a "Luby's" cafeteria every day and that he usually left the garage at about 10:45 a.m. in order to "beat the crowd." The manager of the "Luby's" cafeteria testified that he saw Syvertson at approximately 11:00 a.m. on the day in question.

Mrs. Syvertson testified that she went to Syvertson's garage sometime between 11:00 a.m. and noon. At that time, she noticed Syvertson's gray Chevrolet Corsica parked outside. The doors to the garage were locked. She knocked on the doors but got no answer, so she left.

Katie Jordan testified that she contacted Syvertson by telephone sometime between 11:30 and 11:45 a.m.  Syvertson told her that he could do some repair work for her employee, Bob Bruner, if he brought his car to the garage right away. When Bruner arrived at the garage between 12:20 and 12:30 p.m., the gray Corsica was parked outside, a light was on inside the garage, and a large fan was running on the side of the garage, but the doors to the garage were locked. Bruner knocked but got no answer. Bruner parked his car outside the garage and left. At 1:30 p.m., Bruner called Syvertson from his cell phone but got no answer. Bruner drove by the garage at about 2:00 p.m. The gray Corsica was still parked outside, and the light and fan were still on. Bruner returned to the garage at about 5:30 p.m. The gray Corsica was still parked outside, the light and fan were still on, and the garage doors were locked. Bruner knocked on the garage doors again but got no answer.

Mrs. Syvertson testified that she went back to the garage sometime in the afternoon and found the doors still locked. She knocked but got no answer. She went to get her daughter, who had a key to the garage. When they returned at 7:00 p.m., the gray Corsica was gone. Once inside the garage, they found Syvertson's body lying face down in a pool of blood next to a white Chevrolet Corsica. (Apparently, Syvertson was working on the white Corsica when he was murdered.) Rigor

2

mortis had set in, and it appeared that Syvertson had been hit in the head several times with a hard object. The wallet he usually carried and the keys he usually kept clipped to his belt loop were both missing, and one of his pants pockets had been turned inside out. Several valuable tools were also missing from the garage. A bolt on an office door was broken and hanging by a single screw. Police testified that the door "looked like it had been kicked in."

The medical examiner who performed the autopsy on Syvertson's body testified that the manner of death was homicide and the cause of death was blunt force head injuries.  Syvertson suffered multiple abrasions and lacerations to the front and back of his head. Many of the abrasions had a crescent or half-moon shape, and one had a circular outline. The blows were delivered with a blunt object that had a round, flat surface and was either fairly heavy or used with a great deal of force. The medical examiner estimated that the time of death was between 11:00 a.m. and 2:00 p.m.

Several witnesses testified that they saw appellant in the vicinity of the garage on the day of the murder. Robert Menefee testified that appellant came to his house "sometime after lunch" and inquired about buying some illicit drugs. Terry Seaton testified that appellant arrived at his house on foot at 3:00 p.m. Appellant told Seaton that he had been getting "high" on crack cocaine and asked Seaton whether he would sell him some crack. Seaton refused to sell drugs to appellant but gave appellant a small amount of change and drove him to "some duplexes" nearby.

At about 7:30 p.m., appellant arrived at the home of his friend Lisa Tucker, who was about to leave on a date with her boyfriend, Marcus Tilley. Appellant told Tucker and Tilley that his car had broken down, and he asked for a ride to his mother's house. On the way, appellant pointed to a gray Corsica parked behind a house and told them that it was his wife's car and that it had stalled.

As they approached the intersection near Syvertson's garage, they saw police, an ambulance, and crime scene tape. Tucker and Tilley wanted to drive by the garage to see what was going on, but appellant asked that they continue driving. Tilley decided to turn and drive by the garage. Before they reached appellant's mother's house, appellant had Tilley drop him off "at a house on Gaston Street." Menefee's residence was on Gaston Street.

Appellant visited Menefee's residence again that evening. They talked briefly, and appellant left on foot. Between 9:00 and 10:00 p.m., appellant returned to Seaton's house and spoke to him for a few minutes, then continued down the alley on foot.

Lashundra Hall testified that she saw appellant smoking crack cocaine in Longview sometime in the afternoon or evening.  She saw him again at about 3:20 a.m. the next morning, and appellant was driving a gray Corsica. He asked her where he could "get more crack and rent the car out for crack." She got into the car, but they were stopped by Longview police about ten minutes later. Police discovered title and registration documents to the gray Corsica in appellant's pocket. Syvertson's keys were in the ignition.

Fingerprint and DNA evidence recovered from the garage connected appellant to the crime. Appellant's fingerprints and a palm print were found on the white Corsica next to Syvertson's body. Syvertson's son testified that a hammer leaning against a plastic bottle on a shelf near the body was out of place. Hairs found on the bottle were consistent with appellant's DNA.

Witnesses testified that a man named Ray Charles Berry was in the vicinity of Syvertson's garage at 1:30 p.m. on the day of the murder. Berry, who lived in the neighborhood, was seen standing near Syvertson's garage at 1:30 p.m. eating lunch out of a brown paper sack. No evidence

4

linked Berry to the crime; Berry's fingerprints did not match any of those found on the white Corsica.

In a hearing outside the presence of the jury, Berry invoked his Fifth Amendment right against self-incrimination.[1]

**Procedural history**

Russeau was indicted for capital murder under TEXAS PENAL CODE § 19.03 (a)(2), for killing Syverston in the course of a robbery.  He was tried by a jury and on October 7, 2002, he was found guilty of the offense.  On October 10, 2002, after a punishment determination hearing, the jury found:

> a.  There was a probability that he would commit acts of criminal violence which would constitute a continuing threat to society,
>
> b. he actually caused the death of the victim, and
>
> c. taking into consideration all of the evidence, including the circumstances of the offense,  Russeau's character, his background, and his personal moral culpability, there were not sufficient mitigating circumstances to warrant imposing a life sentence, rather than a sentence of death.[2]

As a result of these findings, the trial court sentenced Russeau to death.

Russeau appealed his conviction and sentence, and while his appeal was pending, he filed a petition for post-conviction relief.  The Texas Court of Criminal Appeals affirmed his conviction, but vacated his death sentence and remanded his case to the trial court for a new punishment-determination hearing.  *Russeau v. State*, 171 S.W.3d 871, 887 (Tex.Crim.App. 2005).  Russeau filed a petition for a writ of *certiorari* regarding his underlying conviction, but it was denied.  *Russeau v. Texas*, 548 U.S. 926 (2006).

---

[1] *Russeau v. State*, 171 S.W.3d 871, 87 7 (Tex.Crim.App. 2005).

[2] *See* TEX. CODE CRIM. PROC. Art. §37.071 (2001).

Russeau's second punishment-determination hearing was held in April of 2007, and resulted in the same findings and sentence as his first.  He again appealed, and while his appeal was pending he filed a second petition for state post-conviction relief.  On July 1, 2009, his appeal was denied.  *Russeau v. State*, 291 S.W.3d 426 (Tex. Crim.App. 2009).  A year later the court denied Russeau's second petition for post-conviction relief, *Ex parte Russeau*, 2010 WL 3430765, No. WR-61389-02 (Tex.Crim.App. August 25, 2010), and six months later it denied his first.  *Ex parte Russeau*, 2011 WL 1158777, No. WR-61389-01 ( Tex.Crim.App. February 16, 2011).

**Claims**

Russeau raised nine claims for relief:

1. Trial counsel's failure to call witnesses to contradict the State's evidence at the guilt or innocence stage of the trial was ineffective assistance of counsel and a violation of Petitioner's Sixth Amendment right to counsel.

2. Trial counsel's failure to argue at trial that law enforcement planted evidence at the crime scene was ineffective assistance of counsel and a violation of Petitioner's Sixth Amendment Right to Counsel.

3. Hair fibers found on evidence collected from the crime scene and alleged to belong to Petitioner were the product of prosecutorial misconduct in violation of his 14th Amendment due process rights.

4. The trial court's *in camera* inquiry of Petitioner regarding whether his counsel should, or should not, present mitigation evidence on his behalf during the punishment phase interfered with counsel's strategic decision to call such witnesses, thereby violating Petitioner's Sixth Amendment right to counsel.

5. Trial counsel rendered ineffective assistance of counsel and violated Petitioner's Sixth Amendment Right to Counsel by failing to conduct a *Daubert* hearing in advance of the State's offer of expert testimony concerning the issue of future dangerousness.

6. Trial counsel's failure to call any witnesses to debunk the notion that future dangerousness can be predicted was ineffective assistance of counsel and a violation of Petitioner's Right to Counsel under the Sixth Amendment.

6

7. Trial counsel rendered ineffective assistance of counsel by failing to object to Petitioner's retrial solely on the issue of punishment in violation of the Sixth Amendment, Eight Amendment and Fourteenth Amendment.

8. Petitioner was denied due process and the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments during his second penalty trial when the trial court appointed the same attorneys who represented the Petitioner at his first trial while there were pending, unadjudicated claims of ineffective assistance of counsel against these attorneys regarding their performance at the Petitioner's first trial.

9. The actions of Jeff Haas, the Petitioner's State Habeas counsel, in failing to conduct an investigation of any of the facts of the Petitioner's case, failing even to attempt to interview any of the witnesses or potential witnesses involved in the Petitioner's case, failing to challenge the reappointment of trial counsel while a claim of ineffective assistance of trial counsel was pending against them, to investigate the facts pertaining to the actions of trial and appellate counsel, potential mitigation, and potential prosecutorial misconduct and planting of evidence and failing even to attempt to secure funds for investigation or to obtain any records pertaining to the Petitioner's background, including birth records, school records and medical records, fell so far below the standard of care required of the Texas Court of Criminal Appeals for counsel doing state *habeas corpus* work in capital cases as to constitute ineffective assistance of counsel and a denial of the Petitioner's rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

## Standard of Review

Russeau's application is governed by AEDPA, 28 U.S.C. § 2254. Under § 2254(d)(1), if the state court denied the petitioner's claim on the merits, a federal court may grant *habeas corpus* relief only if the state court's adjudication of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States...." To be clear, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be *unreasonable.*" *Williams v. Taylor,* 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)

(emphasis added); *see also Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) ("It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."). "A state court's decision is contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court cases ... or if the state court decide[s] a case differently than the United States Supreme Court previously decided a case on a set of nearly identical facts." *Jones,* 600 F.3d at 535 (citations and internal quotation marks omitted). Similarly, "[a] state court's decision involves an unreasonable application of clearly established federal law if the state court 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.' " *Fields v. Thaler,* 588 F.3d 270, 273 (5th Cir.2009) (quoting *Williams,* 529 U.S. at 407–08, 120 S.Ct. 1495).

AEDPA also governs the Court's review of factual determinations. *See Chester v. Thaler,* 666 F.3d 340, 348 (5th Cir.2011). Under § 2254(e)(1), the state court's factual findings are accorded a presumption of correctness and the petitioner may only rebut this presumption with clear and convincing evidence. *See Miller–El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Moreover, the federal courts may not grant habeas relief unless the state court determination "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Finally, the Court may not review a *habeas* claim "if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both *independent* of the merits of the federal claim and an *adequate* basis for the court's decision." *Finley v. Johnson,* 243 F.3d 215, 218 (5th Cir.2001) (emphasis added). Thus, "[a]s a rule, a state prisoner's habeas claims may not be entertained by a federal court when (1) a state court [has] declined to address [those] claims because

8

the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." *Maples v. Thomas,* ——— U.S. ———, 132 S.Ct. 912, 922, 181 L.Ed.2d 807 (2012) (citation and internal quotation marks). The twin requirements of independence and adequacy demand that the state court's dismissal must " 'clearly and expressly' indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims." *Finley,* 243 F.3d at 218 (quoting *Amos v. Scott,* 61 F.3d 333, 338–39 (5th Cir.1995)). Put differently, "[t]o produce a federally cognizable default, the state procedural rule 'must have been 'firmly established and regularly followed' by the time as of which it is to be applied.' " *Busby v. Dretke,* 359 F.3d 708, 718 (5th Cir.2004) (quoting *Ford v. Georgia,* 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991)). A petitioner may not overcome a procedural default based on independent and adequate state grounds, unless the prisoner can establish cause for the default and actual prejudice as a result of the alleged violation of federal law, or that the failure to consider his claims would result in a fundamental miscarriage of justice because he is "actually innocent" of the offense underlying his conviction or "actually innocent" of the death penalty. *Williams v. Thaler,* 602 F.3d 291, 307 (5th Cir.2010) (citing *Schlup v. Delo,* 513 U.S. 298, 326–27, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Sawyer v. Whitley,* 505 U.S. 333, 340, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992)). While the normal procedure is to consider issues of procedural default first, we may nonetheless opt to examine the merits first, especially when procedural default turns on difficult questions of state law. *Busby,* 359 F.3d at 720.[3]

---

[3] *Roberts v. Thaler*, 681 F.3d 597, 603-05 (5th Cir. 2012), *petition for certiorari filed* Aug. 8, 2012. (No. 12-5682).

**Analysis**

**Claim One**

Russeau's first claim is that his trial counsel's failure to call witnesses to contradict the State's evidence at the guilt or innocence stage of the trial was ineffective assistance of counsel and a violation of Petitioner's Sixth Amendment right to counsel.   This claim was adjudicated on the merits by the state court, *see* Findings of Fact and Suggested Conclusions of Law 11.071 Application for Post-Conviction Writ of Habeas Corpus ("Findings and Conclusions I") pp. 8-46, so the question for this Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, *see* 28 U.S.C. § 2254 (d)(1), or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, *see* 28 U.S.C. § 2254 (d)(2).

In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court held that in order to establish that a defense lawyer's performance was constitutionally ineffective, an applicant must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  To establish deficient performance, an applicant must demonstrate that counsel's behavior fell below an objective standard of reasonableness and the proper measure of attorney performance is simply reasonableness under prevailing professional norms.  Id. at 687-88.   To establish prejudice, an applicant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 694.  Because the state court adjudicated this claim on the merits, to obtain relief in *habeas corpus* Russeau must establish that

it was necessarily unreasonable for the state court to have found (1) that he had not overcome the strong presumption of his counsel's competence, and (2) that he had failed to undermine confidence in the jury's sentence of death.  *See Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S.Ct. 1388, 1403 (2011).

The prosecution's theory of the case was that Russeau murdered Syverston between 11:30 a.m and 1:00 pm, and left the scene with Syverston's wallet.  He then bought and smoked crack cocaine, before returning to the garage at approximately 6:00 pm and taking Syverston's automobile. The defense theory was that although Russeau stole Syverston's automobile, the prosecution had failed to prove beyond a reasonable doubt that he had murdered Syverston.  They contended that evidence of his presence at the murder scene was planted, and noted that a man named Ray Berry was seen in the vicinity of the garage during the afternoon.

Syverston's wife Gladys testified that she went by the garage in the afternoon, but got no answer when she knocked.  She walked around the garage and knocked on the other doors without success, then sat in her car and waited for an hour and a half.  She returned a second time and still received no answer, so she went to her daughter's house and got a key to the garage.  They returned to the garage about 7:00 pm.  At that time Syverston's car was gone, and when they entered the garage they found his body.

Officer Lance Parks spoke with Ms. Syverston at the crime scene, and in his report he states that she told him that when she went back to the garage at around 4:00 pm, she waited in the garage for her husband for nearly an hour before leaving.  Parks interviewed Ms. Syverston at the police department and in his report of that interview he wrote that she said that after knocking on the doors

she sat in her vehicle for an hour and a half.  Parks's police report also states that he spoke with Denise Rangel, who said that she saw Ms. Syverston "go into [the]business" at approximately 3:00 pm.  Ms. Syverston later executed an affidavit in which she stated that either she was so upset that she mistakenly said she waited in the garage instead of in her car, or that Parks had misunderstood her.

Russeau contends that his attorneys should have used the discrepancy between Gladys Syverston's initial statement and her later statements about whether she entered the garage the first time she went to see her husband on the day of the crime to raise doubts about the prosecution's theory of the case.  He argued in his petition that "In a circumstantial case such as this, evidence contradicting the State's time line is critical to raising doubt as to the time of Mr. Syverston's death."  Russeau is quite correct that were the jury were to credit the evidence that Ms. Syverston entered the garage in the afternoon and waited for her husband for an hour, it would have to doubt the prosecution's theory that Syverston was killed in the garage at around 12:30 pm.  The problem with this argument is that the main factual dispute in the trial was not the time of Mr. Syverston's death, but rather, the identity of his killer.  Since Ms. Syverston was not the source of any evidence about who killed her husband, the defense's failure to impeach her credibility about her memory about when she first entered the garage, and to focus its attack on the evidence that tied Russeau to the killing, does not appear unreasonable.

Because Russeau has not established that it was necessarily unreasonable for the state court to have found that he failed to overcome the strong presumption that his trial counsel acted competently in failing to attempt to impeach the testimony of Gladys Syverston, the Court finds that the state court's denial of this claim was neither contrary to, nor the result of an unreasonable

application of, clearly established federal law, as determined by the Supreme Court of the United States in *Strickland*. The Court will deny Russeau's first claim.

**Claim Two**

Russeau's second claim is that his trial counsel's failure to argue at trial that law enforcement planted evidence at the crime scene was ineffective assistance of counsel and a violation of Petitioner's Sixth Amendment Right to Counsel. This claim was adjudicated on the merits by the state court, *see* Findings and Conclusions I, pp. 46 - 48, so the question for this Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The police processed the crime scene on May 30, 2001, and reprocessed it on June 4, 2001. The second time, they found a hammer with grey fibers believed to be hairs from Syverston. The hammer was in contact with a bottle which had tacky grease on it. On June 5, 2001, detectives obtained a sample of Russeau's chest hair. (At the time he was arrested, Russeau's head was shaved.) On June 6, 2001, Detective Roberts took the hammer, the bottle, and the sample of Russeau's chest hair to the DPS Crime Lab in Garland, Texas. The lab found two hairs on the top of the bottle, and in a March 13, 2002 report it stated that the DNA in the hairs found on the bottle were consistent with Russeau's DNA profile. Russeau alleges that detectives placed two of his hairs on the bottle before they gave it to the Crime Lab. He contends that although the defense was granted funds to hire a DNA expert to independently test the hair samples, they did not thoroughly and competently investigate the possible planting of the evidence.

13

At the evidentiary hearing for Russeau's post-conviction proceedings for his first trial,  one of his attorneys testified that his recollection was that their hair and DNA expert concurred with the findings of the Crime Lab, *see* RR. Vol. 1, p. 80, while the other attorney testified that he had numerous conversations with their expert but, because only the roots of the two hairs were left after the Crime Lab analyzed them, the expert said he could not do anything with the samples.  *See* RR Vol. 1, pp. 107-108.  Because Russeau has offered no reason as to why his attorneys should not have relied on the advice of their expert witness, he has not established that it was necessarily unreasonable for the state court to have found that he had not overcome the strong presumption of his counsel's competence.  The Court finds that the state court's denial of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Strickland.*  The Court will deny Russeau's second claim.

**Claim Three**

Russeau's third claim is that hair fibers found on evidence collected from the crime scene and alleged to be his were the product of prosecutorial misconduct in violation of his 14th Amendment due process rights.  This claim was adjudicated on the merits by the state court, *see* Findings and Conclusions I, pp. 47 and 49, so the question for this Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Russeau contends that the following points support his claim that Detective Roberts planted hairs from Russeau onto the bottle he sent to the lab for testing.  First, although Russeau's head was shaved, the nurse who obtained hair samples from Russeau originally testified that she plucked hairs from his head, then later admitted that she could only have plucked them from his chest.  Second, she did not seal the envelope containing Russeau's chest hairs in a way that would show whether Detective Roberts opened and resealed the envelope before it was given to the Crime Lab.  Third, Detective Roberts testified that at the time he first obtained the bottle, he did not notice any hairs on it.  Fourth, because the roots of the hairs found on the bottle were consumed during DNA testing by the Crime Lab, it cannot now be established whether they were chest hairs instead of head hairs or whether they were plucked, as opposed to having fallen out.

While Russeau does show that it was possible that the hairs found on the bottle could have been planted by Detective Roberts, his evidence falls well short of showing that it was unreasonable for the state court to have found that they were not.  Because the state court's determination of this claim was not based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, the Court will deny Russeau's third claim.

**Claim Four**

Russeau's fourth claim is that the trial court's *in camera* inquiry of Petitioner regarding whether his counsel should, or should not, present mitigation evidence on his behalf during the punishment phase interfered with counsel's strategic decision to call such witnesses, thereby violating Petitioner's Sixth Amendment right to counsel.  Because this claim has not been presented

15

to the state courts, it is unexhausted.[4]  In this circumstance, the Court has three options: allow Russeau to return to state court and present the claim to the state court in a successive petition, treat the claim as if it were procedurally defaulted, or deny the claim on its merits.

The Court must first determine whether to allow Russeau to return to state court to present this claim.  If it is entirely clear that the state court would refuse to hear a successive petition containing the new claim, the Court must treat the claim as if the state court had already rejected it on procedural grounds.  *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).  The first question for the Court is whether it is entirely clear that the state court would refuse to consider the merits of this claim if Russeau were to present it in a successive petition.

To answer this question the Court applies Texas law.  TEX. CODE CRIM. PROC. Art. 11.071 §5(a) provides that if a successive application for a writ of *habeas corpus* is filed after filing an initial application, a court may not consider the merits or grant relief on the application unless the application contains specific facts establishing that:

> (1) the current claims and issues have not been presented previously because the factual or legal basis of the claim was unavailable on the date the applicant filed the initial application;

> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

> (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor on one or more of the three sentencing issues.

---

[4] Russeau made the same complaint about his original punishment determination hearing.  The state court found that the claim had not been properly preserved by contemporaneous objection, and it also denied the claim on its merits.  *See* Findings and Conclusions I, p. 50-51.

In the present case, Russeau does not contend either that the factual or legal basis of this claim was unavailable at the time he filed his initial state post-conviction application for relief.  Nor does he contend that in the absence of any constitutional errors no rational juror could have voted to convict him or sentence him to death.  Accordingly, it is entirely clear that the state court would refuse to reach the merits of this claim if the Court allowed Russeau to return to that forum and present this claim in a successive petition.  The Court will treat this claim as if it had already been procedurally defaulted.

As explained above, federal courts generally do not review procedurally defaulted claims unless the applicant can establish either: (1) he had good cause for failing to fairly present his claims, and he would be prejudiced by not being given an opportunity to do so in the federal court, or (2) failing to address the claims on their merits would result in a fundamental miscarriage of justice, either because he is actually innocent of the offense or because but for the constitutional error no rational juror would have found him eligible for the death penalty under state law.  Russeau does not contend that he had good cause for failing to raise this claim in his state proceedings, and he does not contend either that he is actually innocent of capital murder or that no reasonable juror would have voted to sentence him to death had they known the facts in this case.  Accordingly, the Court will dismiss Russeau's fourth claim with prejudice.

**Claim Five**

Russeau's fifth claim is that his trial counsel rendered ineffective assistance by failing to conduct a *Daubert* hearing in advance of the State's offer of expert testimony concerning the issue of his future dangerousness.  This claim was adjudicated on the merits by the state court, *see* Findings of Fact and Suggested Conclusions ("Findings and Conclusions II"), pp. 5-6, so the question for this

Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

In *Barefoot v. Estelle*, 463 U.S. 880, 897-99 (1983), the Supreme Court of the United States held that in the sentence determination phase of a capital murder trial, expert opinion testimony on the issue of whether the defendant would be likely to commit future criminal acts which would pose a continuing threat to society was admissible, despite the lack of scientific support for the validity of such predictions.  Ten years later, the Supreme Court held that in order to be admissible, expert testimony must be both relevant to the issue and reliable and set out five factors to weigh in assessing credibility: whether the theory upon which the testimony is based has been tested, whether it has been subjected to peer review and publication, its known or potential rate of error, whether standards exist which control the operation of the techniques used in determining the basis of the opinion, and the degree to which the theory upon which the opinion is based has been accepted by the scientific community. *See Daubert v. Merrill-Dow Pharmaceuticals*, 509 U.S. 579, 593-94 (1993).

Because the techniques of assessing and predicting the likelihood of future dangerousness do not meet the reliability standards of *Daubert*, there are questions about the continuing validity of *Barefoot v. Estelle.  See e.g. Flores v. Johnson*, 210 F.3d 456, 464-66 (5th Cir.), *cert. denied*, 531 U.S. 987 (2000)(Garza, J., concurring).  Nevertheless, in the punishment determination phase of Russeau's first capital murder trial, upon a motion *in limine* by the defense the trial court conducted a *Daubert* hearing to determine the admissibility of testimony by expert witnesses for the prosecution that there was a probability that Russeau would be dangerous in the future, and the trial judge ruled

18

that the expert testimony was admissible.  At Russeau's punishment determination rehearing, his counsel pointed out that they had conducted a *Daubert* hearing in the first trial to the admissibility of expert testimony as to the likelihood of his future dangerousness, asked the court to take judicial notice of those arguments, and stated that they would urge the same arguments that they made at the first hearing.  The trial judge responded that she did take judicial notice of the prior *Daubert* hearing and she would maintain the same rulings as she made in the prior hearing.  *See Russeau v. State*, 291 S.W.3d 426,  437-38 (Tex. Crim. App. 2009).

Russeau contends that his counsel should not have simply urged the same arguments that they made in his first sentencing hearing; they should have requested a new *Daubert* hearing and made new arguments.  Because he does not say what the new arguments would have been, however, it is impossible for the court to determine whether, had his counsel asked for and received a new hearing, the trial court would have prohibited the state's expert witnesses to testify.  As explained above, in order to obtain relief in *habeas corpus* based upon a claim of ineffective assistance of counsel, a petitioner must establish, *inter alia*, that it would have been unreasonable for the state court to find that he had failed to undermine the jury's sentence of death.  Because Russeau has not met this burden, the Court finds that the state court's rejection of this claim was not the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Strickland.* The Court will deny Russeau's fifth claim.

**Claim Six**

Russeau's sixth claim is that his trial counsel's failure to call any witnesses to debunk the notion that future dangerousness can be predicted constituted ineffective assistance.  This claim was adjudicated on the merits by the state court, *see* Findings and Conclusions II, p.6, so the question for this Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

As mentioned in the discussion of the previous claim, Judge Garza stated in a concurring opinion in *Flores v. Johnson* that "[o]verall, the theory that scientific validity underlies predictions of future dangerousness has been rejected by the scientific community absent those individuals who routinely testify to, and profit from, predictions of future dangerousness." *See* 210 F.3d at 466.  The defense did attempt to cross-examine the State's expert witnesses on the grounds that their predictions were not scientifically reliable.  The Court understands Russeau's argument to be that any competent lawyer would know that an attack on the validity of the science of predicting future dangerousness would be more made more effectively by the testimony of a different scientific expert, rather than by mere cross-examination of the state's expert.

As explained previously, in order to prevail on a claim of ineffective assistance of counsel a petitioner must establish that it would have been unreasonable for the state court to have found that defense counsel's conduct was deficient and that, had counsel acted competently, there was a reasonable probability that the result in the proceedings would have been different.  The Court

assumes *arguendo* that it would have been unreasonable for the state court to have found that Russeau's counsel's failure to obtain and present expert testimony that predictions of future dangerousness are not scientifically reliable, and to instead rely only on cross-examination to make this point to the jury was not deficient conduct.  But Russeau does not address whether, had the defense obtained and presented expert testimony that expert predictions of future dangerousness were not scientifically reliable, there was a reasonable probability that the jury would have found that he was not a future danger.  Russeau does not attempt to show that had the defense presented this testimony, there was a reasonable probability that the result in his re-sentencing hearing would have been different, and so fails to establish that it would have been unreasonable for the state court to find  that he had failed to undermine the jury's sentence of death. Because the state court's rejection of Russeau's sixth claim was not the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Strickland,* the Court will deny Russeau's sixth claim.

### Claim Seven

Russeau's seventh claim is that his trial counsel rendered ineffective assistance of counsel by failing to object to Petitioner's retrial solely on the issue of punishment in violation of the Sixth Amendment, Eight Amendment and Fourteenth Amendment  This claim was adjudicated on the merits by the state court, *see* Findings and Conclusions II, p.5, so the question for this Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

On page 30 of his petition, Russeau stated:

> State habeas counsel, Jeff L. Haas, asserted in the 2009 writ that trial counsel's failure to object to the constitutionality of retrying Petitioner solely on the issue of punishment was ineffective assistance of counsel and a violation of Mr. Russeau's Sixth, Eight(sic) and Fourteenth Amendment rights. In support of this claim, counsel reasoned that it is "Constitutionally impermissible" to require a jury, already aware of the fact that Petitioner had been tried, convicted and sentenced to death, to consider solely the issue of punishment in a subsequent trial.

As previously discussed, to prevail on a claim of ineffective assistance of counsel a petitioner must establish that it was or would have been unreasonable for the state court to find that counsel did not act deficiently and also that it was or would have been unreasonable for the state court to find that had counsel acted appropriately, there was not a reasonable probability that the result in the state proceeding would have been different.  Russeau appears to argue that the trial court would have to have sustained an objection to retrying solely whether the appropriate punishment for him was life in prison or the death penalty, so his counsel's failure to object constituted ineffective assistance by not objecting.

The problem with this argument is that Russeau does not cite any authority supporting the proposition that a retrial solely on the issue of punishment is unconstitutional, and the Court has found none.  In the absence of such authority, Russeau cannot establish that it was necessarily unreasonable for the state court to have found that he failed to overcome the strong presumption that his trial counsel acted competently in failing to object to his being retried solely on the issue of punishment.  Because the state court's rejection of Russeau's seventh claim was not the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Strickland,* the Court will deny Russeau's seventh claim.

22

**Claim Eight**

Russeau's eighth claim is that he was denied both due process of law and the effective assistance of counsel in violation of the Fourteenth and the Sixth Amendments in his punishment retrial, when the trial court appointed the same attorneys who represented him at his first trial while there were pending, unadjudicated claims of ineffective assistance of counsel against these attorneys regarding their performance at that first trial.   This claim was adjudicated on the merits by the state court, *see* Findings and Conclusions II, pp.6 - 7, so the question for this Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The State appointed Clifton Roberson and Brandon Baade to represent Russeau at his original trial.   After he was convicted and sentenced to death, he filed both a direct appeal and a petition for post-conviction relief.   In his petition for post-conviction relief, he contended that Roberson and Baade had provided ineffective assistance of counsel at both the guilt-determination phase and the punishment determination phase of his trial.   The Texas Court of Criminal Appeals upheld the trial court's guilt determination but vacated its death sentence determination and remanded the case back to the trial court for a new sentencing hearing.   While the appeal was pending, the trial court held an evidentiary hearing on Russeau's ineffective assistance of counsel claim.   At that hearing, trial counsel answered questions about their discussions with Russeau concerning trial strategy.   On February 7, 2005, the  trial court judge entered findings of fact and conclusions of law in which she determined that Russeau's trial counsel had not been ineffective at either phase of his trial.

23

On November 17, 2006, the trial court held a pre-trial hearing in preparation for Russeau's re-sentencing hearing.  At that hearing, Russeau requested that the court appoint him different counsel.  He contended that his trial counsel had waived the attorney client privilege in testifying at the evidentiary hearing, with the result that the prosecution understood the defense strategy.  He also contended that they had provided ineffective assistance at the punishment phase of his trial, and he contended that there had been a breakdown in communication between he and his counsel.  The trial judge denied his request, finding that counsel had only waived the attorney client privilege because she ordered them to do so in order to decide the ineffectiveness claim, and finding that she had found that trial counsel was not ineffective and the Texas Court of Criminal Appeals had reached the same conclusion.[5]  As to the breakdown in communication, she ordered Russeau to talk with his attorneys and ordered them to talk to him.  *See* RR Vol. 2, pp. 10-14.

The Sixth Amendment guarantees criminal defendants the right to representation at all critical stages of the proceedings.  *Coleman v. Alabama*, 399 U.S. 1, 7, (1970).  The right encompasses the right to conflict-free representation.  *Wheat v. United States*, 486 U.S. 153, 159-60 (1988).  In order to establish an actual conflict of interest in the *habeas corpus* context, a petitioner must show that the conflict adversely affected his counsel's performance.  *See Mickens v. Taylor*, 535 U.S. 162, 171 (2002).

Assuming *arguendo* that Russeau's pending allegation of ineffective assistance created a conflict with his trial counsel at the time of his sentencing retrial, the issue for the court is whether that conflict adversely affected his counsel's performance.  Russeau stated in his application that "The fact that defense counsel continued to represent petitioner while his claims of ineffective

---

[5] The Texas Court of Criminal Appeals did not adopt the trial judges's findings until 2011.

assistance were pending adversely affected his representation in this case," but provided neither explanation nor evidence as to how it did so.  In the absence of any showing of adverse effect, the Court finds that the state court's rejection of this was neither contrary to, nor the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Mickens.*  The Court will deny Russeau's eighth claim.

**Claim Nine**

Russeau's ninth and final claim is that the actions of Jeff Haas, his state post-conviction counsel, in failing to conduct an investigation of any of the facts of his case, failing even to attempt to interview any of the witnesses or potential witnesses involved in his case, failing to challenge the reappointment of trial counsel while a claim of ineffective assistance of trial counsel was pending against them, to investigate the facts pertaining to the actions of trial and appellate counsel, potential mitigation, and potential prosecutorial misconduct and planting of evidence and failing even to attempt to secure funds for investigation or to obtain any records pertaining to Russeau's background, including birth records, school records and medical records, fell so far below the standard of care required of the Texas Court of Criminal Appeals for counsel doing state habeas corpus work in capital cases as to constitute ineffective assistance of counsel and a denial of the Petitioner's rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

Because this claim has not been presented to the state courts, it is unexhausted.  As explained in the analysis of Russeau's fourth claim, the Court has three options: allow Russeau to return to state court and present the claim to the state court in a successive petition, treat the claim as if it were procedurally defaulted, or deny the claim on its merits.

The Court chooses the third option.  In *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) the Supreme Court of the United States held that claims of ineffective assistance of state post-conviction counsel are not cognizable in federal *habeas corpus*.  In *Martinez v. Ryan*, ___ U.S. ___, ___, 132 S.Ct. 1309, 1315 (2012), the Supreme Court recognized an exception to the rule in *Coleman*: If under state law a claim of ineffective assistance of state trial counsel can only be brought in the first instance in state post-conviction proceedings, an unreasonable failure to raise such a claim by state post-conviction counsel could constitute cause to excuse the procedural default of the claim.

In the present case, however, Russeau does not contend that his trial counsel failed to raise a claim of ineffective assistance of trial counsel in his state post-conviction proceedings. Accordingly, his claim does not fall within the scope of *Martinez*, and it is instead foreclosed by *Coleman*.  The Court will deny Russeau's ninth and final claim.

**Conclusion**

For the above reasons, the Court will dismiss Russeau's fourth claim with prejudice, and it will deny his other claims on the merits.  An Order and Judgment to this effect will be entered.

**So ORDERED and SIGNED this 26th day of December, 2012.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

26